IN THE UNITED STATES DISTRICT COURT
IN THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Docket No. 15-56-1 |
| v. | : | (J. Andrews) |
| | : | (*Electronically filed*) |
| RAHEEM RIDLEY | : | |

EMERGENCY MOTION
FOR REDUCTION OF SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1) - *Compassionate Release*

Though none of the inmates at low security, Federal Correctional Institution Elkton in Lisbon, Ohio are serving a death sentence, the possibility they could die while serving sentence there is all too real. Six inmates at FCI Elkton have died of coronavirus since it hit the facility during the last week of March 2020; and the number of inmates there who require COVID-19 related hospitalization or quarantine continues to grow.

Raheem Ridley, by and through his counsel, Dina Chavar, Esquire, respectfully moves this court, pursuant to 18 U.S.C. 3582(c)(1)(A), to modify Mr. Ridley's term of imprisonment to time-served, and to impose a special condition that he serve a period of home confinement on supervised release. Such modification will effectively allow him to finish the remaining portion of his prison sentence on home confinement; a 4-month reduction from the term he is to serve *in prison*. Mr. Ridley is currently approved for early release to home confinement in September 2020.[1] This modification request essentially seeks that Mr. Ridley's pre-release date be moved up some 4-months. Due to the dire circumstances at FCI Elkton, this motion is being brought on an emergent basis. Mr. Ridley's life is literally at risk each day he remains at FCI Elkton.

---

[1] A defendant is generally eligible for pre-release to halfway house and/or home confinement 6-months prior to his sentence release date. Mr. Ridley's release date is May 5, 2021. His pre-release date, 6-months prior to his release date, is November 5, 2020. However, in early January 2020, Mr. Ridley's Case Manager approved him for pre-release 2-months earlier, to September 5, 2020, due to his good behavior and overall performance while serving time.

1

### The COVID-19 Pandemic and its Effect on Prison Populations

On March 13, 2020, the President of the United States declared a national emergency due to the evolving threat by the outbreak and spread of coronavirus in this Country. The Centers for Disease Control and Prevention ("CDC") announced that as of March 31, 2020, there was 163,539 confirmed and presumptive cases of COVID-19 in the United States.[2] The World Health Organization ("WHO") reported that as of March 31, 2020, there was 750,890 reported cases in 172 Countries with at least 36,405 coronavirus related deaths, and declared COVID-19 a global pandemic.[3] To date, the WHO reports 2,074,529 reported cases globally, thus attesting to the rapid spread of this highly infectious disease that can lead to death.[4]

In early March, 2020, the CDC released a report explaining how the coronavirus is "spread mainly from person-to- person . . . [b]etween people who are in close contact with one another . . . [t]hrough respiratory droplets produced when an infected person coughs or sneezes."[5] The droplets can land in the mouths or noses, or can be inhaled into the lungs, of people who are within about six feet of the infected person.[6] It has since been learned that asymptomatic infected persons can spread the disease without knowing they are infected and that the coronavirus can survive for 24-hours to as much as 3-days on various surfaces. Based largely on these findings,

---

[2] *See* CDC, *Coronavirus Disease 2019 (COVID-19), Cases in the U.S.,* March 31, 2020, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases.

[3] WHO, *Coronavirus Disease 2019 (COVID-19) Situation Report – 71,* March 31, 2020, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/situation-reports/.

[4] *Id.* at *Situation Report – 88.*

[5] *See* CDC, *Coronavirus Disease 2019 (COVID-19), How it Spreads,* March 4, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[6] *See id.*

2

social distancing has been determined to be the most effective way to decrease the spread of COVID-19.

The State of Delaware has adopted and mandated many safe practices based on the concept of social distancing. Residents have been ordered to stay-at-home and employers advised to implement, wherever possible, a work-at-home arrangement. Only occupations and businesses deemed essential to keep the State effective in combatting the virus and maintaining the health and security of residents are permitted to continue operations: medical care personnel, first responders, law enforcement, grocery stores, drug stores, and hardware stores are they types of operations and businesses deemed essential. Since the initial stay-at-home order, the State has implemented further directives, such as: requiring residents to wear a mask whenever there is a risk of being closer than 6-feet from another person; only to leave the home for essentials like groceries and medicine; banning public gatherings; and temporarily closing schools.

The Federal District Court for the District of Delaware remains open for official business, though Chief District Court Judge Leonard P. Stark, in his April 17, 2020 Revised Standing Order, continued all civil and criminal jury trials until after May 31, 2020 "to further public health and safety, the health and safety of Court personnel, counsel, litigants and other case participants, jurors, security personnel and the general public and . . . to reduce the number of gathering necessarily attendant to trial jury selection . . . to minimize travel by participants in Court proceedings, particularly travel by public conveyance." The root of the Standing Order is to enforce social distancing by continuing court procedures which would challenge the ability for people to maintain a 6-foot distance from one another that social distancing demands.

Unlike the Courts and the general public, prisons have found it nearly impossible to implement and follow a practice of social distancing given the number of inmates held together in close, crowded settings. Raheem Ridley is at FCI Elkton, a low security facility in Lisbon, Ohio where each prison block houses 330 inmates who live by twos and threes in "open bay" cubicles of about 12 square feet with six-foot-high walls, called dormitory style housing. It is now widely recognized that the risk of exposure to COVID-19 is significantly greater in prisons than in the general community.

On April 3, 2020, the Office of the Attorney General in Washington, D.C. dispatched a memorandum to the Director of Bureau of Prisons (BOP) reiterating its then one-week-old directive to the BOP to "prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to . . . vulnerable inmates." (Attached as Exhibit A is 4/3/20 AG Barr Memorandum to BOP Director). Attorney General Barr furthered that directive, informing the BOP Director that

> [W]e are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions . . . the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that . . . priority in implementing [the standards for release is given to] the most vulnerable inmates at the most affected facilities . . . Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress. (See Exhibit A, pp. 2-3).

On April 7, 2020, a mere 4-days after Attorney General Barr's directive was released, FCI Elkton reported 3 inmates dead from COVID-19, 37 inmates hospitalized due to COVID-19 and

4

71 inmates in isolation at the facility with symptoms of COVID-19.[7] Several days before, there were only 17 inmates in quarantine and 20 hospitalizations. The first three deaths occurred less than 2-weeks after the virus hit the facility – a testament to the rapid speed at which the virus would spread within the low-security facility.

One-day before the first deaths were reported, Ohio's Governor DeWine ordered the National Guard to assist healthcare personnel at FCI Elkton, yet the coronavirus continued to quickly spread throughout the facility and the numbers infected continued to increase. Videos taken by inmates on smuggled-in cellular telephones began appearing on Facebook and in the media that depicted the facility's dismal circumstances and the impossibility of social distancing in the dorm room style housing.[8]

FCI Elkton staff has been stretched beyond its limits; many have stopped reporting to work for fear of catching the disease. Inmates report that various staff members have advised the facility does not have the manpower to assess the population for early release candidates quickly enough, and that they should seek the assistance of a lawyer to motion for early release. Counsel has not been able to discover whether FCI Elkton has released any inmates in accordance with Attorney General Barr's April 3rd Memo imploring the BOP Director to act without haste to release those who qualify to home confinement.[9]

---

[7] The first coronavirus case at FCI Elkton was reported little more than 2-weeks prior to the three COVID-19 related deaths.

[8] https://www.clevescene.com/scene-and-heard/archives/2020/04/07/at-elkton-federal-prison-in-ohio-37-inmates-hospitalized-due-to-covid-19-3-dead-71-in-isolation

[9] There has been some suggestion that FCI Elkton has not released any inmates to home confinement, because they do not have the manpower to make the required assessment prior to release.

Raheem Ridley qualifies for early release to home confinement. On April 1, 2020, Mr. Ridley submitted his request to the Warden to grant him a compassionate release to home confinement. To date, he has received no response from the Warden.[10]

Mr. Ridley suffers from asthma since early childhood as well as sinus and allergy related respiratory difficulties; conditions which affect the lungs and make him more vulnerable to COVID-19. His performance while serving sentence clearly demonstrates that he is not a danger to the community. Consideration of all relevant 3553 factors further justifies his early release to home confinement. His release plan to confinement at his Aunt's home in New Castle, Delaware has been approved by United States Department of Probation for the District of Delaware as an acceptable living environment. Mr. Ridley should be released to home confinement where he will be far less likely to avoid infection of COVID-19.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Ridley is currently serving a 78-month sentence of imprisonment as a result of his guilty plea to offense conduct involving distributing heroin, conspiracy to distribute heroin and illegal possession of a firearm.[11] He is a year away from his release date; and, approximately 4-

---

[10] Due to the rapidly deteriorating conditions at FCI Elkton, this motion was filed as an emergency matter, requiring the government to respond within 72-hours. Also due to the emergent circumstances at FCI Elkton, Counsel is filing this motion while Mr. Ridley's request is pending so as not to waste any valuable time. Counsel estimates that by the time the Government files its response, the 30-day lapse will be short some 5-days. Counsel will keep the government informed of any action taken by the Warden in response to Mr. Ridley's request immediately upon learning same. Discussed below is authority granting a district court to waive the 30-day lapse requirement under certain circumstances that counsel submits is present here. However, if this Court does not waive the 30-day lapse requirement, and has not decided this motion by April 30, 2020 – when 30-day lapse runs – counsel respectfully requests a teleconference between the parties and the Court.

[11] The firearm found in Mr. Ridley's possession belonged to his co-defendant. He borrowed the firearm from the co-defendant only a few hours before his arrest, and at direction from co-defendant that he needed to be "heavy" if he was heading into Wilmington as it was hot with gunfire at the time. This fact was not disputed at sentencing. Additionally, a firearm was not discovered during a search of Mr. Ridley's apartment and the government did not dispute that it had no evidence that Mr. Ridley was known to carry a firearm.

6

months from his pre-release date. During his entire stint with the BOP, Mr. Ridley has received no infractions or write-ups – a rarely achieved accomplishment among inmates.[12]

"I will make sure I have a job before I leave the halfway house. It doesn't matter what the job is, so long as it's a job," Mr. Ridley told the probation officer during his presentence report interview more than 3-years ago when asked what he will do when released from prison. *Id.* at p. 23. Prior to sentencing, Mr. Ridley researched vocational programs available while in custody and determined he would take the personal trainer course and get certified before his release, because "that will get me a job when I'm out." *Id.* Mr. Ridley completed the personal trainer course while at FCI Elkton, as he planned to do more than 3-years ago.

Rather than restrict his training to only one vocation, in addition to personal training, Mr. Ridley completed the vocational training program for Carpentry.[13] Over the past 18-months, Mr. Ridley completed 10 Adult Continuing Education ("ACE") classes at FCI Elkton. ACE classes usually extend over a 3-month period; typically, Mr. Ridley took at least 2 ACE classes at a time. He wanted to stay busy while serving his time and to use it to learn as much as he could so that he was better equipped for employment when released. Mr. Ridley completed all the business-related ACE classes available: Small Business Start-up, LLC Start-up, Business Management and Accounting Principles. Additionally, he completed ACE classes in: Stock Market, Real Estate, Spanish and Fitness Instructor. Mr. Ridley has achieved conversational level Spanish. After

---

[12] Mr. Ridley was held at Salem County Prison in New Jersey for 22-months, from arrest through sentencing. During that time, he incurred no infractions nor write-ups. The programs he completed and other accomplishments he achieved while at Salem Count, as well as the many favorable comments made by Staff at Salem County with respect to Mr. Ridley's behavior and overall attitude, are discussed in the sentencing memorandum that was submitted on his behalf. (DI 99).

[13] Mr. Ridley was scheduled for relocation to the prison's satellite Camp, adjacent to the low-security housing facility where he is currently, just prior to the appearance of COVID-19 at FCI Elkton. Generally, inmates hope to be transferred to Camp as early as possible and will count off the days until their scheduled transfer. However, Mr. Ridley opted to remain where he is so that he could complete the Carpentry program he was in and was not offered at the Camp.

completing the Fitness Instructor class, he worked as a Fitness Instructor at the prison. Mr. Ridley also completed numerous ACE classes which he describes as self-improvement training: Parenting, Nutrition related classes, and similar type courses. Mr. Ridley describes himself as being an avid reader and states he always has a fiction novel he is reading and usually ends each day by reading from it before falling asleep.

      Mr. Ridley has maintained a good relationship with his now 10-year-old daughter while he has been in custody. He speaks with her regularly. He knows her interests, who her friends are, how she was doing in school and if she was behaving well or not. Although he is in prison several states away, Mr. Ridley considers himself to be the stronger disciplinarian between his daughter's mother and himself. He describes himself as being stricter than her mother and definitely more conservative as far as what she is allowed to do and where she is allowed to go.[14] "She's my heart, right there. So pretty, so smart. She's a good girl." Mr. Ridley is impatient for the day he will reunite with his daughter and begin spending time with her. He has custody rights and is looking forward to securing an apartment where she will have her own room when she stays with him. In every writing and call with her father, she tells him she loves him and cannot wait until he comes home. Mr. Ridley says he starts smiling as he heads towards the phone to call her and does not stop smiling for hours afterwards.

      Mr. Ridley also has a son, who was only several months old at the time of his arrest and is now 5-years-old. Maintaining contact with his son has been a challenge and is largely dependent on the mood of the child's mother. There were long periods of months where she would not answer the phone when Mr. Ridley called and other similar type obstructive behavior. Still, Mr. Ridley made certain he had contact with his child on a fairly regular basis. His younger sister often sits for

---

[14] Mr. Ridley continues to enjoy the same amicable relationship with his daughter's mother as this Court was advised at his sentencing. *(See* DI 99).

8

his son, and Mr. Ridley can call and speak with him during those times as well as when he is with Mr. Ridley's mother. His son's mother does not object to Mr. Ridley being in his life; she just does not make it easy for him to do so. Mr. Ridley plans on working through the courts to secure custody of his son and regular visitation so that she will not be able to make seeing his son difficult when he gets released.

      Mr. Ridley has demonstrated over the past 5-years that he is capable of setting goals and reaching them. He has prepared himself to be marketable in the workplace upon his release; a sign of dedication to leading a lawful life. Mr. Ridley told the probation officer, before the current sentence was imposed, that by the time he is released from this sentence, he will be trained and ready for work, and he will get a job before he gets out of the halfway house. He explained that he was 20-21 years old when he was last released from a prison sentence, and he had a 2-year-old daughter and a woman who needed help supporting his daughter. He applied for every job he could. Twice he thought he secured employment, but it was rescinded upon receipt of his criminal record. Finally, he resorted to crime just to have some income. Mr. Ridley told the probation officer then, and he continues to make the same statement to date: I'm not going back to prison. I'm going to be trained so I can get a job and I'll have a job. When counsel spoke with Mr. Ridley about this motion and the possibility of early release, he asked counsel if he would be able to work while on home confinement or at least start looking for work.

      Mr. Ridley is a devout Muslim man who continued to respect and follow his religion throughout his incarceration. At various times at each facility he served time, Mr. Ridley served as the Imam at that prison - generally considered to be a great honor.[15] Mr. Ridley is rehabilitated and

---

[15] Imam is the most commonly used title for the worship leader of a mosque and Muslim communities. It is a highly respected position and it is considered a great honor to be bestowed Imam. Prior to Mr. Ridley's stint at Salem County Prison, that facility did not have any worship practice in place for its Muslim community. Mr. Ridley initiated daily group prayer within his block. Eventually, working with various staff there, a regular Friday hour of worship was established so that all Muslim inmates could practice Jummah – a weekly prayer petition to Allah. Mr.

9

is ready to reintegrate into society as a productive, law abiding member. The BOP, before coronavirus appeared on the landscape, had already determined that Mr. Ridley was rehabilitated and ready to rejoin society by awarding him a 2-month early pre-release date in recognition of his achievements and consistent good behavior. The current pre-release date is 4-months from the present. It would be a great tragedy if Mr. Ridley contracted COVID-19, a highly possible probability, over the next 4-months and never makes it home.

## DISCUSSION

The compelling circumstances here support the modest sentence reduction requested. First, This Court has jurisdiction because Mr. Ridley has exhausted the administrative remedies that are available to him at FCI Elkton. Second, the First Step Act grants authority to the Court to determine which extraordinary and compelling circumstances warrant a sentence reduction. Third, Mr. Ridley has valid grounds for a modest sentence reduction, given the rapid spread of COVID-19 at FCI Elkton, the BOP's inability to stem the spread, placing him in a grave, life-threatening situation, exacerbated by his respiratory-related, historical illnesses, in combination with the minimal amount of time he has left to serve and a demonstrated showing of rehabilitation.

### 1. The Court has Jurisdiction to Grant Release Pursuant to 18 U.S.C. § 3582

In 2018, Congress enacted the First Step Act which amended the statutory language of 18 U.S.C. § 3582 to provide jurisdiction to federal courts to reduce a sentence and grant release from imprisonment for extraordinary and compelling reasons. The "compassionate release statute," as it has come to be known, was originally introduced in the 1984 Crime Control Act which allowed a district court to modify a final term of imprisonment after finding the existence of "extraordinary and compelling reasons" only upon motion by the Director of the Bureau of Prisons. 18 U.S.C. §

---

Ridley was established as the prison Imam and served in that roll for 18-months until he was designated to a federal facility.

3582(c)(1)(A)(i); *see also* P.L. 98-473, 98 Stat 1837 (Oct. 12, 1984). Unless the BOP filed such motion, the district court had no jurisdiction to reduce a sentence.

Under the First Step Act amendments to the "compassionate release statute," district courts are now empowered to review such motions with or without a motion from the BOP. *See* P.L. 115-391, 132 Stat. 5194 § 603. Upon a showing of "extraordinary and compelling reasons" district courts can reduce a sentence on a defendant's motion, if the defendant has fully exhausted all administrative remedies to appeal the BOP's failure to bring a motion or 30-days have lapsed "from the receipt of such request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A); *see also United States v. MauMau,* No. 08-cr-00758 ("Such a motion may be brought only after the prisoner has exhausted certain avenues of administrative relief."); *United States v. Cantu,* No. 05-cr-00458, 2019 WL 2498923, at *3 (S.D. Tex. June 17, 2019) ("Under the newly amended § 3582(c)(1)(A) [the defendant] has standing to bring this motion because more than 30 days elapsed between his reduction-in-sentence request to the warden and a response."); *United States v. Cantu-Rivera,* No. CR H-89-204, 2019 WL 2578272 at *1 (S.D. Tex. June 24, 2019) (defendant's "petition . . . meets the requirement of a lapse of 30 days from the receipt by the warden of the defendant's facility . . . The Court therefore has authority to address the motion to the defendant.").

Mr. Ridley sent a request for such a motion to the warden of FCI Elkton on April 1, 2020. At the time of this filing, 20 days have since lapsed, and he has not received any reply. Mr. Ridley's counselor has been reassigned to Guard duty and his Case Manager is not reporting to work. Further, the Warden has been inaccessible to all inmates with respect to compassionate release requests. Recently, in the United States District Court for the Eastern District of Pennsylvania, a compassionate release was granted to defendant Jeremy Gonzalez, who was inmate at FCI Elkton.

11

Mr. Gonzalez first filed his request for compassionate release with the Warden, who never responded to it. *United States v. Gonzalez,* No. 03-cr-271 (April 1, 2020) (J. Brody).

Inmates at FCI Elkton are being informally advised through various staff members that they should seek the assistance of a lawyer because the Warden is not addressing any of the release requests, but rather is allowing them to run the 30-days without response or action. This motion is being filed in advance of the 30-days so as not to waste any additional time by waiting the 30-days; by time the government files its response, it will be 5-days short of a 30-day lapse.

In the alternative, this Court can waive the exhaustion period if such delay would subject Mr. Ridley to undue prejudice. *United States v. Perez,* 2020 WL 1546422 (S.D.N.Y.) In *Perez,* the defendant was incarcerated at the Metropolitan Detention Center in Brooklyn, New York where coronavirus infiltrated the facility and quickly spread throughout. Mr. Perez sought compassionate relief but did not request release first from the Warden. There, the Court waived the exhaustion requirement finding that if undue delay results in catastrophic health consequences, exhaustion would be futile; any relief the BOP might provide would likely be inadequate because of undue delay; and Mr. Perez could be unduly prejudice by undue delay." *Id.* (citing *Washington v. Barr,* 925 F.3d 109 (2d Cir. 2019)) ("Even where [administrative] exhaustion is seemingly mandated by statute or decisional law, the requirement is not absolute" and setting forth three basis for waiving an administrative exhaustion requirement); *United States v. Sawicz,* 2020 WL 1815851 (E.D.N.Y.) (Waiving exhaustion requirement where defendant, an inmate at FCI Danbury, a facility experiencing such significant levels of coronavirus infection that AG Barr instructed BOP to "move with dispatch" in release to home confinement, because delay in waiting 30-days to lapse would put defendant at significant risk of suffering catastrophic health consequences) (citing *Washington v. Barr,* 925 F.3d 109).

Mr. Ridley is similarly situated to defendants Perez and Sawicz. He too is being held at a facility that is experiencing significant levels of coronavirus infection. Even a delay of 5-days while waiting for exhaustion to be satisfied before bringing this motion, would put him at a significant risk of suffering catastrophic health consequences. This Court should waive the exhaustion requirement here, as did the Perez and Sawicz Courts.

Accordingly, Mr. Ridley is entitled to bring this motion directly to his sentencing court pursuant to 18 U.S.C. § 3582(c)(1)(A), and this Court is vested with the jurisdiction to rule on the requested relief – either by allowing the 30-days to lapse or waiving the exhaustion requirement.

### 2. Mr. Ridley's Request for Relief is Consistent with the Amended Statute and the United States Sentencing Guidelines

The First Step Act amended the language in Section 3582 under which a sentencing court could reduce a sentence for an "extraordinary and compelling reason." However, the statute does not limit the "extraordinary and compelling reasons" to an enumerated list of circumstances, instead providing federal sentencing courts extensive discretion to decide based on the individual circumstances before it.

The initial step in determining a motion under § 3582(c)(1)(A)(i) is to look to the standards and criteria for establishing "extraordinary and compelling reasons" in Section 1B1.13 of the United States Sentencing Guidelines. The second step is to decide whether, in consideration of the § 3553(a) factors, a reduction is warranted.

The guidelines, at section 1B1.13 state that a reduction can be granted, after consideration of the § 3553(a) factors, if the court determines that extraordinary and compelling reasons warrant the reduction, the defendant is not a danger to the community [in consideration of the usual bail criteria], and the reduction is consistent with the policy statement.

As discussed in depth below, the current conditions at FCI Elkton brought by the coronavirus pandemic, Mr. Ridley's underlying health issues, the brief period of time he has left to serve imprison and his demonstrated rehabilitation, combined together, is an extraordinary and compelling reason to release Mr. Ridley to home confinement. He is not a danger to the community and consideration of the 3553(a) factors favors his release. Thus, Mr. Ridley's release is consistent with the dictates of the amended statute and the sentencing guidelines.

### 3. Extraordinary and Compelling Reasons Support Releasing Mr. Ridley

Mr. Ridley is literally serving the remaining 4-months of his term of imprisonment in a hotbed of coronavirus outbreak. There is no dispute that FCI Elkton has been severely hit by a coronavirus outbreak. Indeed, Attorney General Barr explicitly named FCI Elkton in his April 3rd memo to the BOP Director as a facility that requires priority attention and that the BOP needs to "move with dispatch" in releasing those to home confinement who qualify for such release.

Since childhood, Mr. Ridley has suffered with respiratory-related illnesses – asthma, chronic sinusitis, seasonal allergies, which make him more susceptible to the COVID-19 pandemic. His healthcare was inconsistent when he was a youth due to financial limitations, but he remembers being brought to a doctor a number of times for difficulty breathing, through his mouth and nasal passage, that would often be accompanied with severe headaches. He recalls having an inhaler before his teenage years. He thinks he was supposed to continue to use an inhaler, but was not normally taken to a doctor unless he was actively sick and believes he just fell-off treatment for his asthma that way. As an adult, he suffered with terrible sinus infections that made breathing difficult. On exertion or activity, Mr. Ridley must consciously slow his breathing and take deep breaths often so that he does not lose his breath. He has learned to self-treat his asthma symptoms over the years in this fashion. In the last two physical exams he has had while in custody of the BOP, he was noted to labor with shortness of breath as an on-going condition.

Individuals suffering with illnesses affecting the lungs or respiratory system are more susceptible to coronavirus, and if infected, are likely to have graver results.

Not long after this Country went to National Emergency posture, prisons were identified as potentially being one of the most vulnerable environments for the pandemic to strike and quickly consume the population. Congress, prosecutors, and defense lawyers cried out for the immediate release of non-violent criminals, particularly those with preexisting conditions, to mitigate the viral pandemic spreading throughout the nation's correctional facilities.[16]

Courts quickly joined in the humanitarian effort to proactively protect prison populations from the pandemic. On March 18, 2020, in *United States v. Stephens,* 15-cr-95 (AJN), the Honorable Alison J. Nathan in the Southern District for the District of New York, granted defendant's emergency motion for reconsideration of denial bail and ordered the defendant released with conditions. *Id.* There, Judge Nathan noted that since defendant's initial bail hearing "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent ... [even though] there is not yet a known outbreak among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop." *Id.* at 2 (further citations omitted). Here, we have Judge Nathan's fears realized, a severe outbreak of COVID-19 is ongoing in the prison where Mr. Ridley is housed, and as a result, he is at a heightened risk of contracting the virus.

In a more recent opinion from a neighboring district court in Philadelphia, the Honorable Anita B. Brody spoke pointedly about FCI Elkton, declaring that "Prisons are tinderboxes for

---

[16] *See* The Washington Post: *Prosecutors, defense attorneys press to release inmates, drop charges and thin jail population in response to the coronavirus* (March 19, 2020) at https://www.washingtonpost.com/local/legal-issues; Fox News: *U.S. Starts to release inmates due to coronavirus outbreak* (March 20, 2020) at https://www.foxnews.com/health/us-starts-release-inmates-coronavirus.

infectious disease. The question whether the government can protect inmates from COVID-19 is being answered every day, as outbreaks appear in new facilities. Two inmates have already tested positive for COVID-19 in . . . Elton—the place of Mr. Rodriquez's incarceration." *United States v. Rodriguez,* No. 03-cr-271 (E.D.Pa. April 1, 2020) (Granting compassionate release to defendant at FCI Elkton primarily due to the severe coronavirus outbreak at the facility). In *Rodriguez,* the Court noted Mr. Rodriguez did not fit into the three examples of "extraordinary and compelling reasons" listed in the guideline policy statement, but that a "catchall" provision existed which allowed the Director of the BOP to determine whether some other reason could be extraordinary or compelling. *Id.* at p.3. The Court agreed with defendant's argument that the First Step Act bestows the Court with that same discretion to determine whether other "extraordinary or compelling reasons" exist warranting release. There, the Court concluded:

> That (1) the Court may independently assess whether "extraordinary and compelling reasons" exist; (2) the COVID-19 pandemic – in combination with Mr. Rodriquez's underlying health conditions, proximity to his release date, and rehabilitation – constitute "extraordinary and compelling reasons" that warrant a reduction; (3) Mr. Rodriguez is not a danger to his community; and (4) the factors under § 3553(a) favor reducing Mr. Rodriguez's sentence. *Id.*

Mr. Ridley is at FCI Elkton and suffers with underlying health conditions that make him vulnerable to COVID-19, as was Mr. Gonzalez. Moreover, Mr. Ridley is also in close proximity to his pre-release date – a mere 4 months, and he has demonstrated exceptional rehabilitation. This Court should find, as the *Rodriguez* Court found, that the rapid spread of COVID-19 throughout FCI Elkton, in combination with Mr. Ridley's underlying health conditions, proximity to his release date and his rehabilitation (discussed above in FACTUAL and PROCEDURAL BACKGROUND Section), is an extraordinary and compelling reason warranting Mr. Ridley's early release to home confinement.

Mr. Ridley is housed in close quarters and shares all showers, toilets and sinks with the other 300+ men in his block. He does not have access to sanitizer, gloves or masks. He is without the basic tools the rest of society uses to protect themselves from this aggressive virus while practicing social distancing. Not only is it impossible for Mr. Ridley to socially distance, he does not even have the minimal tools to protect him from those he is unable to distance from. He is literally a sitting duck waiting for the virus to strike. Counsel maintains that by itself it is an appropriate extraordinary and compelling reason for a modest reduction in his sentence and early release. Counsel respectfully suggests that the influx of coronavirus into FCI Elkton in combination with the above discussed factors, strengthens and solidifies an appropriate extraordinary and compelling reason to reduce his sentence 4-months and release Mr. Ridley to home confinement.

### 4. Mr. Ridley is Not a Danger to the Community

Mr. Ridley was sentenced at a category II criminal history, having only one prior felony. His prior conviction and current conviction are for drug trafficking offenses and illegal firearm possession. Although the nature of his criminal conduct is considered violent, the evidence pertaining to the conduct this Court sentenced, is absent of any violent acts committed by Mr. Ridley.

Mr. Ridley was not known to carry a firearm. When he needed a firearm, at the suggestion and direction of his co-defendant, he had to borrow a firearm from his co-defendant. When his apartment was searched after his arrest, no firearm was recovered there. With respect to the substantive distribution charge (count 2), in the 2500+ pages of telephone conversation transcripts and other wire recorded conversations, not once is Mr. Ridley heard talking about a firearm or needing a firearm or wanting a firearm. Not once is he involved in a conversation regarding the need for physical harm or violence towards another. The only time, during the entire 6-months the government was watching and listening, that the need for a firearm is discussed is when he is

dealing with Willie Brothers and is on his way into Wilmington from his Newark apartment. Even then, despite the fact that he borrowed a firearm from Brothers, Mr. Ridley is recorded telling Brothers emphatically – hours before his arrest – that he wanted no part of the upheaval and shootings going on in Wilmington at the time.[17]

Mr. Ridley spent the majority of his 20's in prison. He used his time there productively so that his reintegration into society would be successful. Mr. Ridley never wants to return to prison; he never wants to be physically absent from his childrens' lives again. He presents no danger to the community that he worked hard to become a part of in a productive manner. He served his time and now it is time for him to go home.

### 5. Consideration of the 3553(a) Factors Establishes that Mr. Ridley's Time-Served is Sufficient But No Greater Than Necessary to Accomplish the Goals of Sentencing

At Mr. Ridley's sentencing hearing, counsel argued that defendant's remorse can be determined by the way he serves his time. Then, Mr. Ridley came before this Court for sentencing with a stellar record of good behavior at the prison. That stellar record remains untarnished. Counsel respectfully submits that a prison sentence served with no infractions or write-ups, along with self-imposed vocational training and education, not only demonstrates remorse but rehabilitation as well. The task before this Court is whether the originally imposed sentence of 78-months is still no greater than necessary to achieve the purposes of sentencing. Mr. Ridley has been punished for his serious crimes. The years he has spent in prison, growing from a 22-year-old man to a 28-year-old man, were difficult, lonely years that deprived him of time with his children and are arguably the most difficult time in a man's life to be confined and removed from society. The time Mr. Ridley served has

---

[17] Mr. Ridley was driving to Wilmington when he received a telephone call from Brothers. Brothers advised that it was dangerous to come into the city then, essentially due to a number of shootings that took place and current disagreements that could lead to more shootings. Mr. Ridley's PSR and the government's sentencing memorandum made clear that Mr. Ridley had nothing to do with any of those shootings.

18

provided more than adequate deterrence from recidivating. Rehabilitation has been achieved. Counsel respectfully submits that a sentence of time-served followed by a period of home confinement on supervised release is sufficient but not greater than necessary to achieve the purposes of sentencing.

**WHEREFORE,** for all the foregoing reasons, and for any other reason the Court deems necessary, Mr. Ridley respectfully requests immediate release and the granting of this motion.

Respectfully submitted,

By: */s/ Dina Chavar*
DINA CHAVAR, ESQUIRE

*Attorney for Raheem Ridley*